UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
MARIA GROOM,

                     Plaintiff,                        Case No.   1:22-CV-1080 (TJM/ML)

    -against-

NEW YORK STATE DEPARTMENT OF CORRECTIONS              **COMPLAINT**
AND COMMUNITY SUPERVISION, WALLKILL
CORRECTIONAL FACILITY, PHILLIP MELICIO,             **Jury Trial Demanded**
VINCENT BRUGGER, IAN HUCKABA,
WILLIAM PURDY, KENNETH CADY, KATHRYN
RIFFLARD, and ANTHONY J. ANNUCCI
in their personal and professional capacities,

                    Defendants.
------------------------------------------------------------------------X

       Plaintiff MARIA GROOM, (hereinafter referred to as "Plaintiff"), by and through her attorneys, BERLINGIERI LAW, PLLC, as and for her Complaint in this action against the Defendants NEW YORK STATE DEPARTMENT OF CORRECTIONS AND COMMUNITY SUPERVISION, WALLKILL CORRECTIONAL FACILITY, PHILLIP MELICIO, VINCENT BRUGGER, IAN HUCKABA, WILLIAM PURDY, KENNETH CADY, KATHRYN RIFFLARD, and ANTHONY J. ANNUCCI  in their personal and professional capacities, (collectively referred to as "Defendants"), respectfully alleges as follows:

**NATURE OF CASE**

1.    Plaintiff brings this action for compensatory damages, punitive damages and attorney's fees pursuant to 42 U.S.C. §1983 for violations of her civil rights, as said rights are secured by said statutes and the Constitutions of the State of New York and the United States and for violations of New York State Human Rights Law, Article 15 of the Executive Law ("NYSHRL") § 296, *et seq*., including claims for sexual harassment, sex discrimination, disability

discrimination, familial status discrimination, failure to accommodate requests for reasonable accommodations, retaliation, and aiding and abetting discrimination, and common law tort claims for slander, negligence *respondeat superior*, negligent hiring, training and retention, negligent infliction of emotional distress and any other claims(s) that can be inferred from the facts set forth herein.

**JURISDICTION AND VENUE**

2.     This action is brought pursuant to 42 U.S.C. §1983, 42 U.S.C. § 12101, 42 U.S.C. § 2000(e) and the First, Fifth and Fourteenth Amendments to the United States Constitution.

3.     Jurisdiction is founded upon 28 U.S.C. §§ 1331, 1343 and 1367.

4.     Venue is properly laid in the Northern District of New York under U.S.C. §1391(b), in that this is the District in which the claim arose.

5.     Plaintiff filed a charge with the Equal Employment Opportunity Commission ("EEOC") on or about February 7, 2022, against New York State Department of Corrections and Community Supervision ("DOCCS") and Wallkill Correctional Facility, EEOC No. 525-2022-01017.

6.     On March 17, 2022, DOCCS, Associate Counsel, Danielle D. May, filed a three (3) page response/position statement with the EEOC in response to Plaintiff's EEOC charge, at the request of the EEOC.

7.     On October 19, 2022, U.S. Department of Justice Civil Rights Division issued Notices of Right to Sue for Plaintiff's ADA and Title VII respectively. Annexed hereto as **Exhibit A**.

8.     On or about February 7, 2022, Plaintiff filed a notice of claim pursuant to New York State Gen. Municipal Law Sec. 50(e) against DOCCS and Wallkill Correctional Facility,

Superintendent Phillip Melicio, Dep. Vincent Brugger, Lieutenant Huckaba, Lieutenant William Purdy, Captain  Kenneth Cady, Kathryn Rifflard, via certified mail.

9.      On September 19, 2022, Plaintiff filed a notice of claim pursuant to New York State Gen. Municipal Law Sec. 50(e) against the DOCCS and Wallkill Correctional Facility, via certified mail.

10.    To date , no defendant, agent, or counsel has responded or otherwise acknowledged receipt of above referenced notice of claims pursuant to New York State Gen. Municipal Law Sec. 50(e).

11.    Plaintiff has exhausted all administrative remedies, statutory prerequisites and conditions precedent under state and federal law.

12.    Fees and costs are sought pursuant to 42 U.S.C. § 1988.

## THE PARTIES

13.    At all times relevant to this Complaint, Plaintiff a former Correction Officer, was and is an individual residing in the County of Ulster, State of New York.

14.    Defendant New York State Department of Corrections and Community Supervision or "DOCCS" was and is a New York State agency organized and existing under and by virtue of the laws of the State of New York.

15.    Defendant Walkill Correctional Facility is a New York State correctional facility located at located at 50 Mc Kendrick Rd, Wallkill, NY 12589 within the DOCCS prison system.

16.    DOCCS operates the New York State Correctional Facility "Wallkill Correctional Facility" (herein after referred to as "Wallkill Correctional" or the "workplace"),  a medium security level prison facility for male inmates, located at 50 Mc Kendrick Rd, Wallkill, NY 12589.

17.    Upon information and belief, at all times relevant to this Complaint, Defendant DOCCS maintained more than (15) employees.

18.   Upon information and belief, at all times relevant to this Complaint, Defendant DOCCS has employed twenty (20) or more employees for each working day in each of the twenty (20) or more calendar weeks in the current or preceding calendar year and meets the definition of an "employer" under ADA and all applicable state and local statutes.

19.   Upon information and belief, Defendant DOCC's central office is located at 1220 Washington Ave #9, Albany, NY 12226.

20.   Upon information and belief, Defendant Phillip Melicio ("Melicio") was and is a DOCCS employee and is the Superintendent of the Wallkill Facility.

21.   Upon information and belief, at all times relevant to this Complaint, Defendant Melicio was and is a resident of the State of New York .

22.   Upon information and belief, Defendant Vincent Brugger, ("Brugger") was and is a DOCCS employee, holding the title of Acting Deputy Superintendent of Administration of DOCCS.

23.   Upon information and belief, at all times relevant to this Complaint, Defendant Brugger was and is a resident of the State of New York.

24.   Upon information and belief, Defendant Lieutenant Ian Huckaba ("Huckaba") was and is a DOCCS employee, holding the rank and title of Corrections Lieutenant at the Wallkill Facility.

25.   Upon information and belief, at all times relevant to this Complaint, Defendant Huckaba was and is a resident of the State of New York.

26.   Upon information and belief, Defendant William Purdy ("Purdy") was and is a DOCCS employee, holding the rank and title of Corrections Lieutenant at the Wallkill Facility.

27.   Upon information and belief, at all times relevant to this Complaint, Defendant Purdy was and is a resident of the State of New York.

28. Upon information and belief, Defendant Captain Kenneth Cady ("Cady") was and is a DOCCS employee, holding the rank and title of Corrections Captain at the Wallkill Facility.

29. Upon information and belief, at all times relevant to this Complaint, Defendant Cady was and is a resident of the State of New York.

30. Upon information and belief, Defendant Kathryn Rifflard ("Rifflard") was and is a DOCCS employee in the human resources department.

31. Upon information and belief, at all times relevant to this Complaint, Defendant Rifflard was and is a resident of the State of New York.

32. Upon information and belief, Defendant Anthony J. Annucci ("Anuncci") was and is the Acting Commissioner of DOCCS.

33. Upon information and belief, at all times relevant to this Complaint, Defendant Annucci was and is a resident of the State of New York.

## **BACKGROUND FACTS**

34. Plaintiff's sex is female.

35. Plaintiff worked as a Correction Officer ("CO") for DOCCS commencing in or around March 2018.

36. Plaintiff was assigned to work at DOCCS's Wallkill Facility.

37. Plaintiff was responsible for supervising a floor of approximately 85 male inmates.

38. In or around August 16, 2021, an inmate intentionally placed a fresh mixture liquid bodily substance on Plaintiff's designated correction's officer chair.

39. At approximately 8:40 AM on August 16, 2021, Plaintiff was responsible for inmate supervising "movement" in her cellblock and sat down at the designated correction's officer chair located at the "C2 grill gate" waiting for facility movement.

40.   Immediately upon sitting in the chair Plaintiff felt that her pants and underwear became saturated with an unknown wet substance.

41.   The unknown substance soaked through Plaintiff's clothing and covered her genitalia and backside.

42.   Plaintiff stood up immediately upon feeling the saturation of the unknown substance on the chair, in doing so, the substance began to run down Plaintiff's inner thighs and the back of her legs.

43.   Plaintiff looked down at the chair and noticed a large amount of the liquid bubbled on the chair.

44.   Plaintiff was disgusted and fear for her safety and ran to the office and called the Arsenal and asked for Sergeant Hengerle to call her and explained that she had just sat in an unknown substance and needed assistance.

45.   Plaintiff then proceeded to wipe her pants with paper towels trying to get as much of the liquid off of her as possibly.

46.   The liquid substance got on Plaintiff's hands as she was attempting to stop the liquid from running down her legs.

47.   Sergeant Hengerle called Plaintiff back and Plaintiff explained to him that she sat in an unknown substance was saturated with it and needed assistance.

48.   Sergeant Hengerle informed Plaintiff that he was "busy with a PC inmate, can you call another supervisor."

49.   Plaintiff hung up and called back the first the first extension she had dialed at the Arsenal but got no response, Plaintiff then tried a different extension number and Correction Officer Morrow answered the other line and Plaintiff explained that she needed help.

50. Plaintiff explained to CO Morrow [female] what had just occurred and that she sat in an unknown bodily substance in the CO chair at the C2 gate, CO Morrow said, "Ill be right there" and rushed to Plaintiff's assistance.

51. While waiting for CO Morrow to arrive, Plaintiff redialed the Supervisor extension "5200".

52. CO Westhoff answered Plaintiff's call and her told Plaintiff to "call the package room, Sergeant Startup may be there."

53. Plaintiff called the package room, whereupon CO Joyner [female] answered the phone.

54. Plaintiff began to explain to CO Joyner what had occurred and that she needed help, however CO Joyner stopped Plaintiff and informed her that "I'm [CO Joyner] going to radio him right now."

55. Sergeant Startup called Plaintiff back right away and informed her that "relief was coming to the unit now."

56. CO Westhoff came on to the unit to relieve Plaintiff.

57. Plaintiff was relieved and was met by CO Morrow at the "D2" gate with a change of clean clothing.

58. Plaintiff and CO Morrow proceeded down to the "PC" and were met by Sergeant Startup.

59. Sergeant Startup asked Plaintiff about what had occurred, and she explained that she sat in the chair and became saturated, and she suspected it was bodily fluid, Sergeant Startup then asked whether she believed the situation "intentional."

60. Plaintiff responded in the affirmative and that it was "absolutely" intentional aimed at her and explained how the liquid was very wet and that it appears to have been freshly placed there for her to sit in.

61.   Plaintiff informed Sergeant Startup that the inmates were harassing her and vandalizing equipment, specifically, Plaintiff informed Sergeant Startup that the inmates had pushed her unit's phone box in and removed the C2 grill gate phone off the hook, causing a "phone alarm."

62.   Plaintiff explained to Sergeant Startup that she was unsure of which inmate or inmates caused the disruptions on both occasions.

63.   Plaintiff then was permitted to change her clothes and wash up as best she could at the workplace.

64.   Sergeant Startup then directed Plaintiff to go to "medical" with CO Morrow.

65.   Plaintiff and CO Morrow inspected and smelled Plaintiff's pants, the substance appeared to be urine or a mixture of urine and a viscous substance, possibly semen or another bodily substance.

66.   Plaintiff and CO Morrow noticed that there was a white slimy substance on the backside of Plaintiff's pants.

67.   Plaintiff and CO Morrow explained to the nurses what had just occurred.

68.   The nurses at the medical ("PCU unit) provided Plaintiff an accident report to fill out.

69.   Plaintiff asked the nurses questions about how to fill the accident report form out.

70.   Nurse Schrensel then took the accident report paperwork away from Plaintiff and stated that she would fill out the nurse's section of the report and then stated, "I don't know what to tell you, you just have to fill it out, I sign it and that's all we really do with it."

71.   Nurse Schrensel informed Plaintiff that she needed to fill out the report.

72.   CO Morrow proceeded to call Lt. Huckaba to report their findings on the visible substances on Plaintiff's pants.

73.   Lt. Huckaba took no action and informed CO Morrow that the situation with Plaintiff sitting the saturated chair, in his view was "not considered aggravated harassment[1]."

74.   Lt. Huckaba informed CO Morrow that "nothing could be done [about holding the inmate[s] accountable for saturating the chair with bodily fluids]" and ordered CO Morrow to discard of the clothing in the Arsenal at the Wallkill Facility.

75.   Plaintiff left her pants with C CO Morrow in an unsealed bag with a water and soap soaked towel that Plaintiff had just used to wash herself.

76.   Plaintiff and CO Morrow proceeded to leave the medical unit and head to the Watch Commander 's Office.

77.   Upon entering the Watch Commander's Office, Plaintiff was greeted by Sergeant Startup.

78.   Plaintiff asked Startup whether she could go home and shower.

79.   Startup said "Yes. But you're gonna return to work? Correct?"

80.   Plaintiff agreed to return to work as she was a model employee who cared for the safety and welfare of her co-workers at the Wallkill Facility.

81.   CO Morrow then went to the Arsenal and discarded the pants and underwear.

---

[1] N.Y. Penal Law 240.32 – Aggravated Harassment of an Employee by an Inmate, states "An inmate or respondent is guilty of aggravated harassment of an employee by an inmate when, with intent to harass, annoy, threaten or alarm a person in a facility whom he or she knows or reasonably should know to be an employee of such facility or the board of parole or the office of mental health, or a probation department, bureau or unit or a police officer, he or she causes or attempts to cause such employee to come into contact with blood, seminal fluid, urine, feces, or the contents of a toilet bowl, by throwing, tossing or expelling such fluid or material.

For purposes of this section, "inmate" means an inmate or detainee in a correctional facility, local correctional facility or a hospital, as such term is defined in subdivision two of section four hundred of the correction law.   For purposes of this section, "respondent" means a juvenile in a secure facility operated and maintained by the office of children and family services who is placed with or committed to the office of children and family services.   For purposes of this section, "facility" means a correctional facility or local correctional facility, hospital, as such term is defined in subdivision two of section four hundred of the correction law, or a secure facility operated and maintained by the office of children and family services.

Aggravated harassment of an employee by an inmate is a class E felony."

82.   Plaintiff was concerned with the liquid seeping into her genitals and the residue that began to dry on her from the slimy urine smelling liquid substances that she just encountered at the workplace.

83.   Plaintiff went home and showered.

84.   Plaintiff put on clean clothes and returned to work in a state of shock from the traumatic events that took place just hours prior.

85.   After returning to work an inmate, Harry Mendez, asked Plaintiff if he could clean the soiled chair with water and bleach to "make this all go away."

86.   Plaintiff ended her shift and explained to her husband N. Groom, (a Correction Officer at the Wallkill Facility) ("Mr. Groom") about the situation and Lt. Huckaba's response of not treating this as aggravated harassment.

87.   Plaintiff and her husband decided to call Lt. Huckaba at the facility and spoke with him on speakerphone so that both Mr. Groom and Plaintiff could hear Lt. Huckaba and Mr. Groom and Plaintiff asked why the August 16, 2021, incident was not being treated as aggravated harassment by an inmate.

88.   Lt. Huckaba stated that "The situation isn't listed under the guidelines of aggravated harassment and if she [Plaintiff] feels she [Plaintiff] needs medical treatment, she [ Plaintiff] could go see her personal doctor, that's what we have good health insurance for."

89.   The very next day on August 17, 2021, Plaintiff sought medical treatment at her private OBGYN medical provider.

90.   Plaintiff's OBGYN transmitted a doctor's note excusing Plaintiff from work due to the saturation of the female reproductive system, urinary tract and mucous membranes.

91.   Plaintiff's OBGYN immediately sent Plaintiff to the Garnet Health Medical Center medical center/hospital's Emergency Room ("ER") to receive further medical treatment.

92.   At the hospital's ER, the doctors diagnosed Plaintiff with "sexual assault of an adult" and a yeast infection and performed a battery of tests including a complete rape kit on Plaintiff.

93.   The ER doctors prescribed Plaintiff with multiple antibiotics along with powerful antiviral medication used to treat HIV to take for the next 30 days out of an abundance of caution.

94.   The ER doctors also prescribed Plaintiff a contraceptive medication to ensure no pregnancy from having her genitals soaked with an unknown bodily substance from a male inmate and provided Plaintiff with several injections of medication.

95.   The ER doctors advised Plaintiff that she should have been seen immediately after coming into contact with the unknown substance.

96.   The Plaintiff's OBGYN and ER doctors each advised Plaintiff to seek professional mental health care as a result of the trauma that she endured.

97.   Plaintiff submitted her ER medical records to Defendants shortly thereafter.

98.   Plaintiff saw several mental health providers.

99.   Plaintiff was subsequently diagnosed after the event with  major depressive disorder, single episode, adjustment disorder with mixed anxiety and depressed mood, and post-traumatic stress disorder.

100.  Plaintiff went on medical leave after the incident.

101.  On August 18, 2021, Plaintiff called Lt. Purdy at the Wallkill Facility to inform him of the event that occurred on August 16, 2021 and August 17, 2021, regarding her medical condition and diagnoses.

102.  Plaintiff also explained that he doctors put her on antiviral medication that had strong side effects and that she was required to take the medication for 30 days.

103.  Lt. Purdy was indignant and responded, "Well that sounds horrible, but I don't see this as a sexual assault, that surprised me and my  question is Maria [Plaintiff], where are the pants of yours?"

104.  Plaintiff explained that the pants were in the Arsenal garbage because Lt. Huckaba ordered CO Morrow to discard the clothing in the Arsenal.

105.  Lt. Purdy then asked "So the pants are still in the building?"

106.  Plaintiff responded "yes;" her pants were in the building as far as she knew.

107.  Lt. Purdy then stated, " So once the pants are tested and it's proven to be just water that you sat in, you can stop taking all these meds [medications] and return to work and everything will be fine."

108.  Plaintiff was shocked and appalled by Lt. Purdy's harassment.

109.  Plaintiff responded that she was concerned about the whereabouts of her soiled pants and that she wanted them tested/evaluated.

110.  Plaintiff also asked whether Lt. Purdy received the doctor's note excusing her from work via fax from her care providers at Crystal Run Healthcare.

111.  Lt. Purdy denied receiving any doctor's notes from Plaintiff via fax and responded that "no documentation was received."

112.  In or around August 18 and 19, 2021, Plaintiff submitted a written statement to Danielle Glebocki,("Ms. Glebocki") Deputy Superintendent for Program Services regarding the August 16, 2021 incident.

113. Plaintiff informed Ms. Glebocki on August 18, 2021, that she was seeking union representation and was waiting on blood test results and that she was seeking therapy.

114. In or around August 19, 2021, Defendant DOCCS's workers compensation department permitted Plaintiff to file a claim for workers' compensation benefits.

115. On August 23, 2021, Defendant DOCCS sent Office of Special Investigations ("OSI") investigators to Plaintiff's home unannounced to interrogate her shortly after the incident and coerce a statement out of her on the spot.

116. Plaintiff felt uncomfortable speaking with OSI investigators (Investigator Skerret and Investigator Fichera) in her own home and was startled by their abrupt unannounced appearance at her doorstep and promised to speak with them at a later date.

117. On August 25, 2021, Captain Cady called Plaintiff to inform her that OSI sent a request to the Wallkill Facility meet with Plaintiff the facility's QWL building on August 27, 2021.

118. Captain Cady asked Plaintiff if she whether she "was sure it wasn't just water" that Plaintiff sat in on August 16, 2021, and if it was water, Captain Cady suggested that Plaintiff stop taking the medications as prescribed by her doctors and return to work.

119. Plaintiff was offended and informed Captain Cady that she was not sure of the exact wet substance she sat in and indicated that water doesn't smell like urine and water would not leave a white slimy residue on Plaintiff's pants.

120. On or around August 25, 2021, Captain Cady made false defamatory statements about Plaintiff, when he stated to Plaintiff's husband Mr. Groom that Plaintiff "sat in water" and that she should return to work.

121. Mr. Groom responded to Captain Cady "you all want it to be water, don't you."

122. In fact, the Wallkill Facility did not treat the incident immediately as aggravate harassment.

123.  Rumors spread at the Wallkill Facility about the incident and why Plaintiff was out of work.

124.  Plaintiff's pants were placed in a garbage bin in the Arsenal, where they sat unattended to with no chain of custody for 11 days, until they were turned over to OSI on or about August 27, 2021, only after Plaintiff indicated that the pants were likely still at the Wallkill Facility.

125.  Plaintiff agreed to meet with OSI on August 27, 2021 at the QWL building at the Wallkill Facility.

126.  At this meeting which started at 11:15AM on August 27, 2021 and lasted until only about 12:00 PM noon, the OSI agents asked Plaintiff offensive questions about the incident, doubted her story and even asked Plaintiff whether she had sex with inmates.

127.  The OSI agents refused to have the pants evaluated/tested for bodily fluids and suggested that Plaintiff could have sat in water.

128.  The Wallkill Facility took no immediate action during Plaintiff's leave of absence.

129.  However, after the August 27, 2021, meeting with OSI, Matt Sheridan, ("Mr. Sheridan"), Plaintiff's union representative, informed Plaintiff that Defendant Superintendent Melicio of the Wallkill Facility elevated Plaintiff's claims to aggravated harassment.

130.  Specifically, Mr. Sheridan stated via text "I thought you should know that your situation was elevated to aggravated harassment, superintendent [Melicio] just informed me that."

131.  Lt. Huckaba failed to follow proper procedure or contact the command center.

132.  Lt. Huckaba failed notify anyone of a higher rank at the Wallkill Facility regarding Plaintiff's complaints.

133.  Lt. Huckaba failed to inform other DOCCS staff or female COs that a male inmate had intentionally placed a bodily substance on a CO chair.

134.  On August 21, 2021, Plaintiff had delivered three doctor's notes inside a sealed envelope addressed to Lt. Purdy dropped in the medical drop box outside of Lt. Purdy's office.

135.  One doctor's note was dated August 17, 2021 from her OBGYN, one doctor's note was dated August 17, 2021 from Plaintiff's ER doctors and stated Plaintiff's diagnosis of sexual assault and yeast infection and listed all the medications that Plaintiff was prescribed and the length of the need to take such medications, and the third note was dated August 19, 2021 from Plaintiff's primary care physician that excused Plaintiff from work until at least September 1, 2021.

136.  Plaintiff repeatedly requested to the Defendants that her pants be tested, however the Wallkill Facility refused and OSI held off until it was necessary, and Plaintiff spoke with the New York State Police and filed a detailed report of the incident of August 16, 2021.

137.  OSI intentionally failed to evaluate/test the pants for months and delayed in handing over the pants to the New York State Police crime lab for testing .

138.  Upon information and belief, months later in or around early 2022, the pants were evaluated/tested by the New York State Police crime lab.

139.  Upon information and belief, on May 11, 2022, Plaintiff learned the test results of her pants from the New York State Police crime lab confirmed that the substance contained urine and male DNA of an inmate incarcerated at Wallkill facility, housed on Plaintiff's unit at the time of incident, and was and was inconclusive on any other bodily substance.

140.  On or about August 28, 2021, Lt. Purdy sent Plaintiff a letter in the mail containing official DOCCS stamps indicating 'Received August 24, 2021" that only contained two out of the three doctor's notes that Plaintiff submitted.

141.  Upon information and belief, Lt. Purdy discarded Plaintiff's doctor's note from the ER and the ER report and diagnoses in order to harass Plaintiff or minimize her injuries to DOCCS.

142.  Plaintiff called Lt. Purdy after receiving his letter, on or about August 28, and ask Lt. Purdy whether he had received the ER report that had the diagnoses and medication on it, Lt. Purdy respond that he "did not" receive it, despite Plaintiff providing it to him with the other two doctor's notes in the same envelope that he indicate he received.

143.  On or about September 2, 2021, at around 11:00 AM, Defendant Rifflard, the Wallkill Facility's personnel employee called Plaintiff to inform Plaintiff that her workers compensation claim was being denied by the State.

144.  Defendant Rifflard informed Plaintiff that the only way that she could receive a paycheck was to email her a letter addressed to Dep. Brugger requesting authorization to use accrued vacation time as an alternate accrual in order to get paid for her medical time off.

145.  Defendant Rifflard was terse and hostile to Plaintiff and informed her that the only way that she could get paid was to write her a letter addressed to Dep. Brugger, and that Plaintiff only had a few hours to do so if she wanted to get paid, because Defendant Rifflard was leaving and would not return until September 7, 2021.

146.  Plaintiff did not immediately send an email to Dep. Brugger as Ms. Rifflard requested or speak with Ms. Rifflard directly thereafter, because Ms. Rifflard's actions and revelation that her worker's compensation claim had been unjustly denied left Plaintiff shocked and upset.

147.  On September 7, 2021, upon Ms. Rifflard's return to the office, Plaintiff called Ms. Rifflard to explain that Plaintiff did not feel that she should have to surrender her vacation accruals and explained that Plaintiff was awarded a vacation spot on the Wallkill Facility vacation schedule

and had a family vacation planned in November 2021 and was going to use the vacation time for that.

148.  At that point on September 7, 2021, Plaintiff had not received official notice from Albany that her workers compensation claim was denied in writing.

149.  Shortly therafter on September 7, 2021, in the afternoon Plaintiff received a certified mailed denial letter of her worker's compensation claim (date of injury August 16, 2021) signed by Dep. Brugger.

150.  The September 7, 2021 denial letter had the box marked for the denial as "There is good and sufficient reason to believe the disability resulting from such injury or disease is not work-related or is primarily due to some pre-existing medical condition."

151.  On September 10, 2021, DOCCS sent Plaintiff correspondence from Dawn Martini, a DOCCS Payroll Examiner 1, indicating that Plaintiff was removed from the payroll at her own request because she not working nor on approved leave that resulted in an alleged overpaid to Plaintiff for five days of work for a total of $1,263.15.

152.  The September 10, 2021 correspondence indicated that DOCCS would collect her alleged overpayment for five days of pay because Plaintiff was not working.

153.  On September 13, 2021, Dep. Brugger sent Plaintiff a letter  that advised her that as of August 18, 2021, Plaintiff was placed on sick leave without pay effective August 19, 2021.

154.  Dep. Brugger's September 13, 2021 correspondence also requested that Plaintiff continue to timely forward updated medical documents to the Medical Information Office and requested a statement releasing Plaintiff to full duty when appropriate.

155.  Plaintiff followed up with her appointments while she was on leave and provided doctor's notes as required.

156.  On October 4, 2021, Plaintiff updated Lt. Purdy and Ms. Glebocki via email with respect to her medical leave and her expected return to work date of October 8, 2021, pending her need to see a psychiatrist as soon as possible.

157.  Defendant Purdy sent Plaintiff notices of non-conforming documentation despite Plaintiff submitting valid complaint medical paperwork, directly from the provider as required.

158.  For example, on October 4, 2021, Lt. Purdy sent Plaintiff and email requesting more medical documentation despite the fact that Plaintiff had already submitted compliant medical documentation putting her out until at least October 8, 2021.

159.  Plaintiff followed up with Lt. Purdy on or about October 7, 2021, advising him that she was unable to return to work under the orders of her health provider and that Plaintiff would send medical documentation as soon as available.

160.  On or about October 7, 2021 and October 12, 2021.

161.  For example, on or about October 28, 2021, Plaintiff's mental health provider sent Plaintiff's medical paperwork to Dep. Brugger, extending Plaintiff's leave until February 22, 2022 and providing a revaluation date of November 24, 2021.

162.  On November 24, 2021, Plaintiff's mental health provider sent documentation maintaining that Plaintiff's leave was until February 22, 2022 and providing a revaluation date of December 22, 2021.

163.  On November 19, 2021, Plaintiff provided was interviewed by New York State Police investigators regarding the August 16, 2021 incident at the Wallkill Facility.

164.  Plaintiff was evaluated in December 2021 and January 2022 and submitted compliant medical paperwork to Defendants.

165.  Nonetheless Defendants harassed Plaintiff for providing noncompliant paperwork regarding her medical leave due to her disabilities.

166.  On January 13, 2022, Plaintiff filed a FOIL request with Wallkill Facility's Records Access Officer, Kathleen Masiello ("Ms. Masiello").

167.  On or about January 20, 2022, Ms. Masiello followed up with Plaintiff and informed her that she would reply to her FOIL request within 20 business days.

168.  On February 11, 2022, Ms. Masiello sent Plaintiff a response to her FOIL request stating that "This is not releasable pursuant to Public Officers Law §87 (2) (g) where records are inter-agency or intra-agency materials which are not statistical of factual tabulations or data; final agency policy or determinations."

169.  On or about February 16, 2022, Plaintiff submitted an appeal to DOCCS regarding Ms. Masiello' February 11, 2022, denial of Plaintiff FOIL request.

170.  In or around February 22, 2022, Plaintiff provided subsequent documentation that permitted her to be on leave until May 22, 2022.

171.  In or around April 2022, Defendants communicated with Plaintiff to inform her that the August 16, 2021 incident was not considered aggravated harassment because the unknown liquid substance was not expelled at Plaintiff

172.  After Plaintiff learned the results of the DNA test from the New York State Police crime lab that confirmed that the pants contained urine from a male inmate incarcerated on Plaintiff's unit at the Wallkill facility, New York State investigators informed Plaintiff that no criminal charges would be filed against the inmate because allegedly there was not enough evidence to show that the inmate expelled the bodily substance to constitute aggravated harassment.

173. On or about April 18, 2022, Plaintiff filed a Union grievance against DOCCS and several individual defendants for violating the aggravated harassment directive.

174. Plaintiff felt unsupported at the workplace and felt the investigation and determination that the August 16, 2021, incident was not considered aggravated harassment was not adequate.

175. Plaintiff could not subject herself to a workplace that doubted she suffered from aggravated harassment and were convinced that Plaintiff had sat in water.

176. Plaintiff was constructively discharged on or about June 22, 2022, as no reasonable person under similar circumstances as Plaintiff would return to such a workplace permeated by gender bias.

177. Upon information and belief DOCCs Commissioner Annucci failed to act with respect to the Plaintiff's claims of aggravated harassment against the inmate[s] who placed the unknown substance on the chair, the lackluster response by the Wallkill Facility and the harassment of Plaintiff while on medical leave.

178. Upon information and belief DOCCs Commissioner Annucci failed to follow the DOCCS aggravated harassment directive and/or failed to implement policies with respect to the designation of incidents as aggravate harassment or have adequate training for his subordinates on how to handle situations similar to what the Plaintiff experienced at awork as a female CO in a male prison facility within DOCCS.

179. Upon information and belief DOCCs Commissioner Annucci failed to secure the safety of his female COs working within male prisons in the DOCCSs, including Plaintiff at the Wallkill facility.

180. Upon information and belief DOCCs Commissioner Annucci failed to investigate Plaintiff's complaints to DOCCS.

181.  Upon information and belief DOCCs Commissioner Annucci failed to follow up with Plaintiff with respect to her wellbeing and failed to delegate any follow up to Plaintiff to another DOCCS employee to ensure the welfare of female COs employed by DOCCS.

182.  Upon information and belief DOCCs Commissioner Annucci condoned the actions of all other individual defendants with respect to Plaintiff.

## AS A FIRST CAUSE OF ACTION
## FOR VIOLATIONS OF 42 U.S.C. § 1983

183.  Plaintiff repeats and re-alleges each and every allegation made in the above paragraphs of this complaint.

184.  All of the aforementioned acts of Defendants, their agents, servants and employees, were carried out under the color of state law.

185.  All of the aforementioned acts deprived Plaintiff of her rights, privileges and immunities guaranteed to citizens of the United States by the First, Fifth, and Fourteenth Amendments to the Constitution of the United States of America, and in violation of 42 U.S.C. § 1983.

186.  The acts complained of were carried out by the aforementioned individual Defendants in their capacities as DOCCS employees, with all the actual and/or apparent authority attendant thereto.

187.  All acts complained of were carried out by the aforementioned individual Defendants in their capacities as police officers, pursuant to the customs, usages, practices, procedures, and the rules of DOCCS, all under the supervision the DOCCS Commissioner Defendant Annucci, Defendant Melicio the Superintendent of the Wallkill Facility and all lower ranking subordinates.

188. Defendants, collectively and individually, while acting under color of state law, engaged in conduct which constituted a custom, usage, practice, procedure or rule of the respective municipality/authority, which is forbidden by the Constitution of the United States.

189. The acts complained of deprived Plaintiff of her rights to be free of sex discrimination and gender bias at the workplace at the DOCCS Wallkill Facility.

190. Defendant DOCCS, deprived Plaintiff equal protection under the law based on her sex.

191. Plaintiff has suffered damages as a result of said violations.

### AS A SECOND CAUSE OF ACTION
### FOR VIOLATIONS OF 42 U.S.C. § 1983
### MONELL LIABILITY
### (AS TO DEFENDANTS DOCCS, WALLKILL FACILITY, ANNUCCI and MELICIO)

192. Plaintiff repeats and re-alleges each and every allegation made in the above paragraphs of this complaint.

193. At all times alleged herein, the individually named employees and named Defendants were employed by DOCCS, acting on its behalf, and within the scope of their employment.

194. At all times alleged herein, the individually named employees and named Defendants failed to enforce the DOCCS policies and procedures regarding aggravated harassment or sexual assault in the workplace when Plaintiff complained about sex harassment, discrimination, her hostile work environment, cronyism, retaliation and corruption and the rumors spreading at the Wallkill facility for her departure and the slow nature of the investigation and the fact that her saturated pants sat in the Arsenal trash for eleven (11) days without a chain of custody and were not tested until months later by the State Police who confirmed that the substance was confirmed to contain urine and contained male DNA.

195.  At all relevant times the individually named Defendants/employees violated Sec. 1983 and the U.S. Constitution when they sexually harassed Plaintiff and failed to do anything about her complaints and then retaliated against her and when she was taken off payroll, harassed, denied benefits and constructively discharged.

196.  Throughout Plaintiff's employ, Defendants executed official policies: where the aggravated harassment protocol was not followed, the sexual assault protocol was not followed, the discrimination complaints were unaddressed; DOCCS employees were allowed to retaliate against other employees for engaging in protected activities with impunity; and where DOCCS employees were also allowed to retaliate against employees for reporting instances of aggravated harassment and sexual assault from unique circumstances such as how Plaintiff sat in a saturated chair contaminated with male inmate bodily fluids.

197.  At all times alleged herein, the individually named Defendants possessed final decision making authority and were policymakers as defined by 1983.

198.  Defendants' actions described above directly and proximately have caused and continue to cause Plaintiff to suffer damages.

## AS A THIRD CAUSE OF ACTION
## FOR RETALIATION UNDER 42 U.S.C. § 1983
## AND THE FIRST AMENDMENT

199.  Plaintiff repeats and re-alleges each and every allegation made in the above paragraphs of this complaint.

200.  Plaintiff engaged in protected activities when she complained that she felt that she was being mistreated and not believed about her diagnosis of the August 16, 2021 incident as sexual assault and a yeast infection and was doubted that she sat in male bodily fluids by DOCCS

employees who insisted that it was just water, and that Plaintiff could stop taking her antiviral medications that caused her strong side effects and come back to work.

201.  As described herein, Plaintiff experienced retaliation immediately after she complained to DOCCS. After multiple complaints, Plaintiff was constructively discharged and resigned.

202.  By the acts and practices above, the Defendants retaliated against Plaintiff for engaging in protected activities, in violation of 1983 and the First Amendment.

203.   Defendants' actions described above directly and proximately have caused and continue to cause Plaintiff to suffer damages.

**AS A FOURTH CAUSE OF ACTION
FOR DISCRIMINATION UNDER
TITLE VII**

204.  Plaintiff repeats and re-alleges each and every allegation made in the above paragraphs of this complaint.

205.  Title VII states in relevant part as follows: SEC. 2000e-2. [Section 703] (a) Employer practices: It shall be an unlawful employment practice for an employer - (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to h[er] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; . . .

206.  Defendant DOCCS engaged in unlawful employment practices prohibited by 42 U.S.C. §2000e et seq., by allowing race discrimination, color discrimination, sex/gender discrimination, religious discrimination and causing a hostile work environment.

207.  Defendant violated the above and Plaintiff suffered numerous damages as a result.

## AS A FIFTH CAUSE OF ACTION
## FOR RETALIATION UNDER
## TITLE VII

208.  Plaintiff repeats and re-alleges each and every allegation made in the above paragraphs of this complaint.

209.  Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e-3(a) provides that it shall be unlawful employment practice for an employer: "(1) to . . . discriminate against any of h[er] employees . . . because [s]he has opposed any practice made an unlawful employment practice by this subchapter, or because [s]he has made a charge, testified, assisted or participated in any manner in an investigation, proceeding, or hearing under this subchapter."

210.  Defendant DOCCS engaged in unlawful employment practice prohibited by 42 U.S.C. §2000e et seq. by retaliating against Plaintiff with respect to the terms, conditions or privileges of employment because of her opposition to the unlawful employment practices of Defendant.

211.  Defendant DOCCS violated the above and Plaintiff suffered numerous damages as a result.

## AS A SIXTH CAUSE OF ACTION
## FOR DISCRIMINATION UNDER ADA

212.  Plaintiff repeats, reiterates, and re-alleges each and every allegation set forth above with the same force and effect as if more fully set forth herein.

213.  Plaintiff claims Defendant DOCCS violated Title I of the Americans with Disabilities Act of 1990 (Pub. L. 101-336) (ADA), as amended, as these titles appear in volume 42 of the United States Code, beginning at section 12101.

214.  ADA SEC. 12112. [Section 102] specifically states "(a) General Rule. - No covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of

employees, employee compensation, job training, and other terms, conditions, and privileges of employment."

215. Defendant DOCCS violated the section cited herein by failing to consider Plaintiff's requests for a reasonable accommodation, as well as discharging, creating and maintaining discriminatory working conditions, and otherwise discriminating against Plaintiff because of disabilities.

216. Defendant violated the above and Plaintiff suffered numerous damages as a result.

## AS A SEVENTH CAUSE OF ACTION
## FOR RETALIATION UNDER ADA

217. Plaintiff repeats, reiterates, and re-alleges each and every allegation set forth above with the same force and effect as if more fully set forth herein.

218. ADA SEC. 12203. [Section 503] states, "(a) Retaliation. - No person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter.

219. Defendant DOCCS violated the above and Plaintiff suffered numerous damages as a result.

## AS A EIGHTH CAUSE OF ACTION
## FOR DISCRIMINATION UNDER
## NEW YORK STATE LAW

220. Plaintiff repeats and re-alleges each and every allegation made in the above paragraphs of this complaint.

221. Executive Law § 296 provides that "1. It shall be an unlawful discriminatory practice: (a) For an employer or licensing agency, because of an individual's age, race, creed, color, national origin, sexual orientation, military status, sex, disability, predisposing genetic characteristics,

marital status, or domestic violence victim status, to refuse to hire or employ or to bar or to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment."

222.  Defendants engaged in an unlawful discriminatory practice by discriminating against the Plaintiff because of her sex, and disability and prior complaints, and requests for accommodations and causing a hostile work environment based on sex and disability.

223.  Plaintiff hereby makes a claim against Defendants under all of the applicable paragraphs of Executive Law Section 296.

## AS A NINTH CAUSE OF ACTION
## FOR RETALIATION UNDER
## NEW YORK STATE LAW

224.  Plaintiff repeats and re-alleges each and every allegation made in the above paragraphs of this complaint.

225.  New York State Executive Law §296(7) provides that it shall be an unlawful discriminatory practice: "For any person engaged in any activity to which this section applies to retaliate or discriminate against any person because he has opposed any practices forbidden under this article."

226.  Defendants engaged in an unlawful discriminatory practice by wrongfully retaliating against Plaintiff causing her constructive discharge.

## AS A TENTH CAUSE OF ACTION
## FOR AIDING AND ABETTING UNDER
## NEW YORK STATE LAW

227.  Plaintiff repeats and re-alleges each and every allegation made in the above paragraphs of this complaint.

228. New York State Executive Law §296(6) further provides that "It shall be an unlawful discriminatory practice for any person to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this article, or to attempt to do so."

229. Defendants engaged in an unlawful discriminatory practice by aiding, abetting, compelling and/or coercing the discriminatory behavior as stated herein.

**AS A TENTH CAUSE OF ACTION**
**FOR NEGLIGENCE RESPONDEAT SUPERIOR**
**(AGAINST DEFENDANT DOCCS and WALLKILL FACILITY )**

230. Plaintiff repeats, reiterates, and re-alleges each and every allegation set forth above with the same force and effect as if more fully set forth herein.

231. The above described DOCCS defendant and individual Defendants breached their of maintaining a safe and harassment free workplace and keeping the protection and safety of employees like Plaintiff at the workplace.

232. Defendants are vicariously liable for the physical and emotional injuries suffered by the Plaintiff due to the intentional, deliberate, malicious and reckless assault, threat, affront, abuse, insult and harassment of the Plaintiff by the individual Defendants under the doctrine of respondent superior.

233. As a result of this experience, Plaintiff is afraid of the safety of her and her family's lives and is afraid for her personal safety, has suffered, and continues to suffer great pain of mind and body, shock, emotional distress, physical manifestation of emotional distress, embarrassment, loss of self-esteem, disgrace, humiliation, and loss of enjoyment of life.

## AS AN ELEVENTH CAUSE OF ACTION
## FOR NEGLIGENT SUPERVISION, RETENTION AND TRAINING
## (AGAINST DEFENDANT DOCCS and WALLKILL FACILITY )

234.  Plaintiff repeats, reiterates, and re-alleges each and every allegation set forth above with the same force and effect as if more fully set forth herein.

235.  Defendant DOCCS is responsible for the training and supervision of all employees, agents, contractors and subcontractors who manage the premises including but not limited to the schools and employee/patron safety and have a duty to stop/prevent criminal sexual acts from occurring on the premises.

236.  The actions of individually named Defendants are the responsibility of and are imputed to and binding upon Defendant DOCCS.

237.  Defendant DOCCS had a duty to prevent employees/servants/agents, including Defendants Medina, Cassano and Guzman from acting or engaging in unlawful and/or tortious conduct.

238.  The Defendant DOCCS negligence in hiring, supervising, training and retaining employees/servants/agents that engaged in tortious and/or otherwise unlawful conduct was the direct and proximate cause of Plaintiff's severe injuries.

239.  Plaintiff has suffered and continues to suffer great pain of mind and body, shock, emotional distress, physical manifestation of emotional distress, embarrassment, loss of self-esteem, disgrace, humiliation, and loss of enjoyment of life.

## AS A TWELFTH CAUSE OF ACTION
## FOR NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS
## (AGAINST ALL INDIVIDUAL  DEFENDANTS)

240.  Plaintiff repeats, reiterates, and re-alleges each and every allegation set forth above with the same force and effect as if more fully set forth herein.

241. As described above, all individual Defendants knew or should have known that they intended to cause Plaintiff emotional distress.

242. All individual Defendants' conduct was extreme and outrageous in their own ways.

243. Plaintiff was in the zone of danger from said individual Defendants' actions, and it could be foreseeable that their actions could or would cause emotional distress upon the Plaintiff.

244. Plaintiff was in the zone of danger created by said individual Defendants' actions / omissions when they negligently inflicted emotional distress unto her.

245. The said individual Defendants' actions in perpetrating the above-described conduct, inflicted emotional distress as a result to Plaintiff.

246. The said individual Defendants' actions were harmful and offensive to the Plaintiff and would be harmful and offensive to any reasonable person.

247. Defendants' actions did in fact cause the Plaintiff to suffer severe emotional distress.

248. As a further result of the conduct of the Defendant, the Plaintiff had been and, in the future will be unable to enjoy all of those of life's activities.

249. As a direct and proximate result of Defendants' tortious conduct, Plaintiff has suffered, and continues to suffer great pain of mind and body, shock, emotional distress, physical manifestation of emotional distress, embarrassment, loss of self-esteem, disgrace, humiliation, and loss of enjoyment of life.

### AS A THIRTEENTH CAUSE OF ACTION
### FOR SLANDER
### (AGAINST DEFENDANT CADY)

250. Plaintiff repeats, reiterates, and re-alleges each and every allegation set forth above with the same force and effect as if more fully set forth herein.

251.  Defendant Cady made false defamatory statements about Plaintiff with a reckless disregard for the truth when they stated that Plaintiff "sat in water."

252.  Defendant Cady published the false statement that Plaintiff sat in water to a third party.

253.  Plaintiff's reputation was harmed as a result of said false statement by Defendant Cady.

254.  As a direct and proximate result of Defendant's tortious conduct, Plaintiff has suffered, and continues to suffer great pain of mind and body, shock, emotional distress, physical manifestation of emotional distress, embarrassment, loss of self-esteem, disgrace, humiliation, and loss of enjoyment of life.

## DEMAND FOR TRIAL BY JURY

255.  Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury on all claims in this action.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

a.  A judgment declaring that the practices complained of herein are unlawful and in willful violation of the aforementioned federal and New York State laws;

b.  Awarding Plaintiff all damages;

c.  Awarding Plaintiff compensatory damages;

d.  Awarding Plaintiff punitive damages;

e.  Awarding Plaintiff consequential damages;

f.  Awarding Plaintiff statutory damages;

g.  Awarding Plaintiff costs and disbursements incurred in connection with this action, including reasonable attorneys' fees, expert witness fees, and other costs;

h.  Pre-judgment and post-judgment interest, as provided by law; and

i.      Granting Plaintiff further relief as this Court finds necessary and proper.


Dated: October 19, 2022
New York, New York


                              Respectfully submitted,


          By:     *Christopher J. Berlingieri*
                  CHRISTOPHER J. BERLINGIERI, ESQ. (519324)
                  BERLINGIERI LAW, PLLC
                  *Attorney for Plaintiff*
                  244 Fifth Avenue, Suite F276
                  New York, New York 10001
                  Tel.:    (347) 766-5105
                  Fax:     (914) 730-1044
                  Email: cjb@nyctlaw.com

# EXHIBIT A

U.S. Department of Justice

Civil Rights Division

NOTICE OF RIGHT TO SUE WITHIN 90 DAYS

VIA EMAIL

*150 M Street, N.E.*
*Karen Ferguson , EMP, 4CON, Room 9.514*
*Washington, DC 20530*

October 19, 2022

Ms. Maria Groom
c/o Christopher Berlingieri, Esquire
Berlingieri Law
244 Fifth Ave., Suite F276
New York, NY  10001

Re:  EEOC Charge Against New York State Dept. of Corrections & Community Supervision, et al.
       No. 525202201017

Dear Ms. Groom:

   Because you filed the above charge with the Equal Employment Opportunity Commission, and more than 180 days have elapsed since the date the Commission assumed jurisdiction over the charge, and no suit based thereon has been filed by this Department, and because you through your attorney have specifically requested this Notice, you are hereby notified that you have the right to institute a civil action against the above-named respondent under:  Title I of the Americans with Disabilities Act of 1990,  42 U.S.C. 12111, et seq., and,  Title V, Section 503 of the Act, 42 U.S.C. 12203.

   If you choose to commence a civil action, such suit must be filed in the appropriate Court within 90 days of your receipt of this Notice.

   The investigative file pertaining to your case is located in the EEOC Buffalo Local Office, Buffalo, NY.

   This Notice should not be taken to mean that the Department of Justice has made a judgment as to whether or not your case is meritorious.

                                        Sincerely,

                                        Kristen Clarke
                                        Assistant Attorney General
                                        Civil Rights Division

                                 by        /s/ Karen L. Ferguson
                                        Karen L. Ferguson
                                        Supervisory Civil Rights Analyst
                                        Employment Litigation Section

cc: Buffalo Local Office, EEOC
   New York State Dept. of Corrections & Community Supervision, et al.



**U.S. Department of Justice**
Civil Rights Division

NOTICE OF RIGHT TO SUE WITHIN 90 DAYS

VIA EMAIL

*150 M Street, N.E.*
*Karen Ferguson , EMP, 4CON, Room 9.514*
*Washington, DC 20530*

October 19, 2022

Ms. Maria Groom
c/o Christopher Berlingieri, Esquire
Berlingieri Law
244 Fifth Ave., Suite F276
New York, NY  10001

Re:  EEOC Charge Against New York State Dept. of Corrections & Community Supervision, et al.
    No. 525202201017

Dear Ms. Groom:

    Because you filed the above charge with the Equal Employment Opportunity Commission, and more than 180 days have elapsed since the date the Commission assumed jurisdiction over the charge, and no suit based thereon has been filed by this Department, and because you through your attorney have specifically requested this Notice, you are hereby notified that you have the right to institute a civil action under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. 2000e, et seq., against the above-named respondent.

    If you choose to commence a civil action, such suit must be filed in the appropriate Court within 90 days of your receipt of this Notice.

    The investigative file pertaining to your case is located in the EEOC Buffalo Local Office, Buffalo, NY.

    This Notice should not be taken to mean that the Department of Justice has made a judgment as to whether or not your case is meritorious.

                  Sincerely,

                  Kristen Clarke
                  Assistant Attorney General
                  Civil Rights Division

         by       /s/ Karen L. Ferguson
                  Karen L. Ferguson
                  Supervisory Civil Rights Analyst
                  Employment Litigation Section

cc: Buffalo Local Office, EEOC
   New York State Dept. of Corrections & Community Supervision, et al.